BRENNAN v. BALTIMORE & O. R. CO.

No. 52.

Circuit Court of Appeals, Second Circuit.

Nov. 18, 1940.

556

Stephen A. Machcinski, of New York City (William P. Allen and Eugene P. Fitzpatrick, both of New York City, of counsel), for plaintiff-appellee.

Harold R. Oakes, of New York City (Robert Schwebel, of New York City, on the brief; William C. Combs, of Rochester, N. Y., of counsel), for defendant-appellant.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

This appeal is from a judgment by the District Court for the Eastern District of New York which was entered on the verdict of a jury awarding damages to the plaintiff for personal injuries received while in the performance of his duties as a brakeman in the employ of the defendant railroad. The suit was brought under the provisions of the Federal Employers' Liability Act, 45 U.S.C.A. §§ 51–59.

The plaintiff, who had for many years engaged in such work, was acting as the head brakeman of an extra freight train of the defendant on a run from Punxsutawney, Penn., to Glenwood in that state. When the train, which included some interstate cars, reached an intermediate station called Etna it consisted of two engines, fifteen cars and a caboose. There its work required the placing of the three cars which were next to the engines upon a siding and the plaintiff was hurt while assisting in doing that in the dark early in the morning of October 7, 1937.

As the train passing slowly along the eastbound track, out of which the siding ran, the plaintiff, who was riding in the cab of the lead engine, dropped off and went over to the target of a derail on the side track to operate the lever that would remove the derail from the track and permit the cars safely to be side-tracked. The derail was a device consisting of a metal block weighing about eighty-four pounds which was designed to lie in use upon the top of one of the rails between any cars on the siding and the switch leading onto the main track so that if such cars started toward the switch they would be derailed when they struck the block. This derail, though not like all in use, was of standard construction. The block could be removed from the rail by first unlocking and removing a padlock from a hasp on the target which was placed on the end of a long tie far enough from the track to be out of the way of the overhang of passing cars; and then by turning a lever, thus released, which caused a fairly heavy metal rod, extending out to the simple block mechanism inside the rail, to move endwise; this transmitted the force to the block through that mechanism to raise it off the rail and swing it on its bearing toward the opposite rail and down into a socket where it rested between the rails at a point so low that it would not be hit by passing cars. Inside the target was a kerosene oil lamp which his duty required the plaintiff to light "at the first opportunity" but he did not take the time to light it. When the lamp was burning a purple light would show when the derail block was on top of the rail and a yellow one when it was off.

The plaintiff testified that he took off the derail padlock; swung the lever to take the block off the rail and down into its socket; felt the block swing off and seat in the socket; put the padlock back on the hasp without locking it; and without looking at the block went back to the train which had stopped to give him time to do his work as stated. At the train he made the cut at the rear of the third car and signaled with his lantern to the engineers to pull ahead. The two engines with the three cars, on one of which the plaintiff rode, then moved on past the switch and stopped. Plaintiff then threw the switch and, signaling to the engineers to back the cars onto the siding, rode on the left stirrup of the first car to go in. This was known as a gondola. It had a flat bottom and was loaded with fire clay. The two following cars, known as hopper cars, were loaded with limestone.

The plaintiff testified that, though he was looking along the side track as the cars went in, he did not see the derail block on the rail but that as the wheels of the car came to where it was located they went off the rails. He signaled to the engineers to stop and rode on the stirrup one and one-half car lengths, approximately sixty-three feet, until the car turned over on its side pinning him under it. He also testified that the cars were moving at the rate of three or four miles an hour when the accident occurred and that an emergency application of the brakes would have stopped them within about two feet. A former engineer of the defendant who had left its employ following another accident testified that a stop could have been made under such circumstances within about eight feet.

■ The derail was introduced in evidence and in the paint upon the block were clear indications that the accident was caused by the car wheels striking it when it was in position to derail a car. There was no evidence of any defect and upon the plaintiff's own testimony it was in proper working order and actually operated as it should when he says he threw the lever. Upon the assumption that he did throw the lever as he said he did, the only reason advanced for the presence of the block upon the rail as the cars moved into the siding was the merest conjecture by way of suggestion that a brake rod on the gondola car which was found bent after the accident might have done it. That, of course, is simply incredible. There was no apparent way for it to have touched the derail ahead

of the wheels so as to swing the heavy block from its socket onto the rail. The force which would have been applied had it struck the derail at all must have been at right angles, or nearly so, to any such movement of the block and the physical impossibility of such a movement from such a cause is obvious. There was not even the suggestion that anyone could have tampered with the derail after the plaintiff left it and that it was in good working order after the accident was amply shown. All this, coupled with its weight and sturdy construction, leaves the plaintiff's testimony that he did throw the lever and moved the block off the rail to set it down in the socket so refuted by physical circumstances that there was no debatable question but that the initial cause of the accident was solely the failure of the plaintiff to perform his duty by turning the lever enough to remove the block from the path of the car wheels. There being no credible evidence that the defendant's negligence brought about derailment it was erroneous to submit that phase of the case to the jury. Schroble v. Lehigh Valley R. Co., 2 Cir., 62 F.2d 993; Pennsylvania Railroad Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819; New Orleans & N. E. R. Co. v. Harris, 247 U.S. 367, 38 S.Ct. 535, 62 L.Ed. 1167.

■ Even after the plaintiff's fault had caused the accident, it is argued that the jury could have found that the defendant failed to stop the cars as soon as possible and that its legal liability for his injuries flows from such neglect under the last clear chance rule. It is clear that due care called for an emergency application of the brakes at once. That obviously was all the defendant could do to relieve the plaintiff from the consequences of his own neglect. The positive evidence of the defendant is that the engineers knew from the shock felt as soon as the wheels left the rails that an accident had occurred and that they immediately made the emergency brake application. There is no need now to say more about the last clear chance doctrine than was said in Jerrell v. New York Central R. Co., 2 Cir., 68 F.2d 856. No matter what label is put upon the defendant's duty after the derailment it was in fact only to stop the movement as soon as it could under the circumstances created by the plaintiff's fault. On that score there is no contradiction of the defendant's evidence that the brakes were applied as much as they could be as soon as they could be except the distance

the cars moved and the opinion of the plaintiff and of the former engineer that that was farther than it should have been. Such contradiction is not substantial and does not present a jury question. The defendant was confronted with an occurrence wholly unexpected which took only a few seconds to end in disaster. The fault with which it is charged depends for its proof, as to which the plaintiff has the burden, upon nice calculations of speed, and quick action by brakes which it was shown without dispute could not reach their maximum efficiency for 4.4 seconds after being applied in normal circumstances. Such an uncertain basis for calculation to produce a test for the defendant's conduct does not rise above the level of mere speculation and fails to provide the substantial evidence of negligence required to prove the plaintiff's cause of action. Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; Southern Ry. Co. v. Walters, 284 U.S. 190, 52 S. Ct. 58, 76 L.Ed. 239; See also, St. Louis S. W. Ry. v. Simpson, 286 U.S. 346, 52 S.Ct. 520, 76 L.Ed. 1152.

The defendant's motion for a directed verdict should have been granted and the reversal and remand must be with directions to dismiss the complaint. Federal Rules of Civil Procedure, rule 50(b), 28 U. S.C.A. following section 723c.

Judgment reversed and cause remanded with directions to dismiss.